IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                  Plaintiff,    )
                                )
v.                              )        Case No. 06-00421-02-CR-W-DW
                                )
VINCENT V. GALLEGOS,            )
                                )
                  Defendant.    )

REPORT AND RECOMMENDATION

Pending before the Court is the issue of whether defendant Gallegos' competency has been

restored so that he is now capable of assisting counsel in his defense. For the reasons set forth

below, it is recommended that the Court find that defendant Gallegos has recovered to such extent

that he is able to understand the nature and consequences of the proceedings against him and to

assist properly in his defense.

I. BACKGROUND

On December 6, 2006, the Grand Jury returned a nine count indictment against defendants

Gordon D. Summers, Vincent V. Gallegos, Scott P. MacDonald and Farryn D. Raney.[1] Defendant

Gallegos is charged in Counts One and Six of the indictment. Count One charges that between

October 1, 2005, and October 16, 2006, all defendants conspired with each other and others to

distribute more than five hundred grams of methamphetamine. One of the overt acts alleged to have

been committed by the co-conspirators in furtherance of the conspiracy alleged in Count One

charges:

---

[1]Defendants Summers and Raney have entered guilty pleas. Defendant MacDonald went
to trial and the jury returned a guilty verdict.

(4)     On or about October 13, 2006, defendant GORDON D. SUMMERS provided firearms to defendants VINCENT V. GALLEGOS and SCOTT P. MacDONALD, and drove them and defendant FARRYN D. RANEY to the residence of Michael Scoville in the blue Cadillac in order to rob Scoville. SUMMERS and RANEY remained in the Cadillac while GALLEGOS and MacDONALD forced their way into the apartment occupied by Scoville and others in order to rob Scoville.

(Indictment at 4)  Count Six charges that on October 13, 2006, all defendants did knowingly and intentionally, during and in relation to a drug-trafficking crime, to wit:  the conspiracy to distribute methamphetamine alleged in Count One, use a firearm, by shooting at and thereby causing the death of Michael M. Scoville.

On May 1, 2007, during a scheduling conference, defense counsel indicated that she might ask for a mental examination of defendant Gallegos at some point in the future.  Government counsel then asked the Court to order a mental examination stating that he believed that the defendant had been declared incompetent in a prior case in New Mexico.  The Court committed defendant to a United States Medical Center for federal prisoners for the purpose of undergoing an examination pursuant to 18 U.S.C. § 4247(b) and (c).  Defendant was sent to the Federal Detention Center in Englewood, Colorado.

The Forensic Evaluation prepared by Dr. Jeremiah Dwyer, dated July 23, 2007, found defendant incompetent to stand trial.  Dr. Dwyer recommended that defendant be committed to a federal medical center for treatment for restoration to competency.  Dr. Dwyer noted that the longer term commitment for the restoration effort would allow for further evaluation of defendant's cognitive impairments.  A hearing was held before the undersigned on August 2, 2007.  The only evidence presented was the Forensic Evaluation dated July 23, 2007.  Based on this evaluation, the undersigned recommended that defendant Gallegos be found incompetent to stand trial and that he

2

be committed to a suitable facility for treatment for restoration to competency. The undersigned noted:

> The report notes that the defendant's cognitive impairments need further evaluation. In addition counsel are requesting that the defendant be placed in a facility that could conduct a neurological evaluation, if deemed appropriate, in light of the allegations of head trauma. Thus, the Court would recommend that the defendant be placed in a facility that could further assess defendant's cognitive and neurological condition.

(Report and Recommendation (doc #62) at 5 n.3)

On August 28, 2007, the District Court found defendant Gallegos incompetent to stand trial. Defendant Gallegos was admitted to the Federal Medical Center in Butner, North Carolina, on September 20, 2007, for a determination as to whether there was a substantial probability that he will attain the capacity to permit the trial to proceed in the foreseeable future.

The Forensic Evaluation prepared by Dr. Jeffrey B. Childers, dated March 10, 2008, found that "although Mr. Gallegos has a mental disease or defect, namely Major Depression, Substance Abuse, and Antisocial Personality Disorder, his mental illness does not preclude him from participating in his legal proceedings if he so chooses." (Forensic Evaluation at 12) The warden of the Federal Medical Center in Butner signed a Certificate of Restoration of Competency to Stand Trial. Despite the Court's Order that a neurological evaluation of defendant be conducted if deemed appropriate, no such evaluation was conducted at Butner.

On February 27, 2008, defense counsel requested that Dr. Stanley Golon, a Board Certified Psychiatrist and Board Certified in Neurology-Psychiatry, be appointed to review defendant's mental health records. The Court granted defendant's request. Thereafter, defense counsel requested funding for neuropsychological testing of defendant. The Court granted defendant's request. Dr. Leif Eric Leaf performed the testing.

3

A competency hearing was held on October 16, 2008. Defendant Gallegos was represented by Susan Hunt. The Government was represented by Assistant United States Attorney Charles Ambrose, Jr. The Government called Farryn Raney (a co-defendant), Dr. Jeffrey Childers (a psychiatrist who performed his forensic psychiatry fellowship at the Federal Medical Center in Butner, North Carolina), Dr. Bruce Berger (a staff psychiatrist at the Federal Medical Center in Butner, North Carolina), Dr. Jill Grant (a forensic and clinical psychologist at the Federal Medical Center in Butner, North Carolina) and Dr. Daniel Martell (a board certified forensic neuropsychologist) as witnesses. The defense called Juana Gallegos (defendant's adopted mother and biological grandmother), Dr. Jeremiah Dwyer (a forensic psychologist with the Bureau of Prisons), Dr. Leif Eric Leaf (a licensed psychologist) and Dr. Stanley Gordon (a board certified psychiatrist) to testify.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the hearing held on October 16, 2008, the undersigned submits the following proposed findings of fact:

1.  Juana Gallegos, defendant's adopted mother who is married to defendant's biological grandfather, testified that defendant's biological mother, Michelle, her husband's daughter, was fourteen years old when Vincent was born. (Tr. at 22) The biological father was in jail when Vincent was born. (Tr. at 22) Michelle used illegal drugs and alcohol when she was pregnant with Vincent and continued to use drugs and alcohol after Vincent was born. (Tr. at 22-23) Michelle even put beer in Vincent's bottle, so that she could sneak out to go dancing. (Tr. at 23) Ms. Gallegos offered to take care of Vincent until he became five years old. (Tr. at 23) At that time, Michelle would be of age and she could take the child back. (Tr. at 23-24) Ms. Gallegos took possession of Vincent when he was eight months old. (Tr. at 24) Ms. Gallegos lived in Las Cruces, New Mexico. (Tr. at 24) According to Ms. Gallegos, when she first got Vincent, he was hyperactive and would shake and almost lose consciousness because he would get so upset. (Tr. at 24)

2.  Ms. Gallegos took Vincent to a pediatrician and it was determined that Vincent was suffering from his mother's drug abuse while he was in the womb. (Tr. at 25)

4

Vincent was put on a medication that was not very strong when he was young. (Tr. at 25) Vincent had problems at daycare. (Tr. at 25) The teachers complained that he was aggressive, that he would not pay attention and that he was a danger to himself. (Tr. at 25) At age five, Vincent was prescribed Ritalin. (Tr. at 25) Michelle refused to come and get Vincent; she said she did not want him back. (Tr. at 26) Michelle had never come to see Vincent since Ms. Gallegos took him in at eight months old. (Tr. at 26)

3.      Ms. Gallegos adopted Vincent. (Tr. at 26-27) Michelle saw Vincent when he was thirteen years old. (Tr. at 27) Michelle had come to a party in Las Cruces and Ms. Gallegos asked Michelle to stop and see Vincent. (Tr. at 27) Vincent already knew that Michelle was his biological mother. (Tr. at 27) While hospitalized at St. Theresa Charter Hospital in El Paso, at age eleven, doctors suggested that it might help Vincent's emotional reactions if he knew the truth that he was adopted. (Tr. at 27-28) This hospitalization was a referral from the school district. (Tr. at 28) Vincent was on the psychiatric ward. (Tr. at 28)

4.      Vincent was never placed in regular classrooms in school. (Tr. at 29) He was in a special class tailored for kids with behavior disorders. (Tr. at 29) Vincent also had learning disabilities. (Tr. at 29) Ms. Gallegos and her husband had a lot of contact with the school. (Tr. at 29) They attended meetings and counseling. (Tr. at 29) Ms. Gallegos' husband gave Vincent rides to and from school because Vincent was not allowed on the buses. (Tr. at 29)

5.      During his young childhood and teenage years, Vincent was in many, many hospitals. (Tr. at 29) He was at Sequoia Adolescent Treatment Center in Albuquerque, New Mexico, Pinon Fields, Espanola in New Mexico, Sallas Treatment Center in New Mexico, WDDC in Albuquerque, New Mexico, Charter Hospital St. Theresa, Pinon Hills, the Mesilla Valley Hospital in Sequoia and Lesson Treatment in Albuquerque. (Tr. at 29-30) These were all referrals through the school for psychiatric help and learning disabilities. (Tr. at 30)

6.      Throughout his childhood years, Vincent was on various medications. (Tr. at 31) He took Prozac and Wellbutrin for bipolar; Haldol and Cogentin for schizophrenia; Thorazine for manic depression; Zoloft for severe depression; and Ritalin for hyperactivity. (Tr. at 31) While on medications, Vincent's behavior, moods and depression seemed to get better. (Tr. at 31) However, he would run away from home or run away from the hospitals and then be off the medications for long periods. (Tr. at 31) When he was off his medications, Vincent would get in trouble. (Tr. at 31)

7.      Vincent was sexually abused by his maternal great-grandfather from the age of eight to twelve. (Defendant's Ex. 1) During his teenage years, Vincent got into trouble with the law. (Tr. at 31) Vincent spent a lot of time in juvenile detention centers.

(Tr. at 31) Vincent reportedly began drinking alcohol when he was twelve years old, which escalated to the use of other drugs including marijuana and crack. (Defendant's Ex. 1) While in a detention center at the age of thirteen, Vincent was raped by an older inmate. (Defendant's Ex. 1) During his late teens, Vincent was charged with domestic violence against a girlfriend. (Defendant's Ex. 1) While incarcerated for the domestic violence charge, Vincent attempted suicide via hanging. (Defendant's Ex. 2)

8. In a Forensic Evaluation dated March 5, 2006, defendant Gallegos was evaluated by Dr. Lori Martinez for his competence to stand trial for charges related to a commercial burglary that occurred on May 11, 2005, in Bernalillo County, New Mexico. (Defendant's Ex. 1) Gallegos was referred to Dr. Martinez by his attorney. (Defendant's Ex. 1 at 2) The evaluation took place on January 13, 2006. (Defendant's Ex. 1 at 2) The Forensic Evaluation provides the following:

Clinical Findings Relevant to Competence to Stand Trial

Mr. Vincent Gallegos was administered the Revised Competency Assessment Instrument in order to obtain a general measure of his knowledge regarding his charges and the legal process. He appeared to decompensate as the questions were presented to him. That is, he became increasingly agitated and uncomfortable with the line of questioning, which appeared related to poor coping skills and history of mental illness. He was very confused and disoriented, and was unable to provide any reasonable information about his charges, the meaning of his charges, and/or the penalty associated with his charges. Mr. Gallegos was unmotivated and lethargic and was basically unresponsive to the various questions presented. He appeared very sad, overwhelmed, and confused with the current evaluation process and could not communicate in a reasonable manner. Despite the fact that he appears to be taking his prescribed medication and is considered compliant in doing so, Mr. Gallegos continues to manifest serious signs and symptoms of a Major Depressive Disorder, with Psychotic Features, and does not appear sufficiently stabilized on his current medication regimen. His current clinical presentation and history is very complex and he requires extensive support and follow up case management in any setting. He is unable to discuss his legal situation with any clarity or coherence, and does not seem to fully grasp his legal case. Mr. Gallegos' mental disorder currently hampers his ability to rationally and factually assist counsel as his ability to communicate is very limited and he does not seem to have a sufficient level of knowledge regarding the legal process. Furthermore, he appears to lack an appreciation for his overall legal situation, and he was unable to provide any rational information about the circumstances related to his arrest and current charges.

Although extreme, Mr. Gallegos' clinical picture appears genuine and there

6

were no substantial indications that he was intentionally feigning or attempting to distort the clinical presentation. In summary, the results of the current forensic evaluation indicate that Mr. Gallegos is suffering from a severe mental illness that is having a negative and disruptive impact on all aspects of his functioning, and in particular his ability to competently proceed with adjudication. Taken together, Mr. Gallegos does not have the present mental stability or capacity to represent his best interests in Court, make relevant legal decisions, communicate in a reasonable manner, and/or withstand the stress of a legal proceeding. It is the opinion of the evaluator that he cannot assist counsel at this time due to his impaired mental status related to his psychiatric illness, and that he is not competent to stand trial. He is in dire need [of] psychiatric care in an inpatient facility.

(Defendant's Ex. 1)

9. Farryn Raney, defendant Gallegos' co-defendant, testified that he was incarcerated with Gallegos at the Bates County Jail. (Tr. at 6) While Raney was confined to his cell for an administrative disciplinary infraction, Gallegos, who was in general population and free to walk up to the cell doors of the inmates who are locked down, came to Raney's cell door to talk. (Tr. at 6-8) Raney asked Gallegos for an update on his case and Gallegos asked Raney basically the same thing. (Tr. at 8) Gallegos told Raney that his intentions were to plead insanity or incompetence to stand trial. (Tr. at 8) This conversation took place in January or February of 2007. (Tr. at 9)

10. During cross-examination of defendant Raney, it was established that when Raney was questioned by police on October 17, 2006, he initially denied being present during the murder of Michael Scoville. (Tr. at 10) At the hearing, Raney admitted that he had bought and sold meth for Gordon Summers. (Tr. at 11) Raney testified that he found out that Scoville owed Summers money for drugs he bought from Summers. (Tr. at 11) Raney further admitted that he told Summers that Scoville was bragging that he had Summers' money and his drugs. (Tr. at 12-13) Raney told police that he was dropped off before the others went over to get the money from Scoville. (Tr. at 13)

11. Defendant Raney testified that he initially made multiple different statements because he was high on methamphetamine. (Tr. at 13) According to Raney, he later realized the best thing to do would be to tell the truth. (Tr. at 13)

12. Defendant Raney testified that he entered into a plea agreement with the Government. (Tr. at 18) In the plea agreement, the Government agreed to dismiss the murder count against Raney. (Tr. at 18) Raney testified against Scott MacDonald who went to trial. (Tr. at 18) Raney is hoping that his testimony against Scott MacDonald and Vincent Gallegos will cause the Government to ask for a lesser sentence. (Tr. at 20)

7

13.     Dr. Jeremiah Dwyer testified that part of his duties at the Federal Detention Center in Englewood, Colorado, is to do competency assessments. (Tr. at 34)  Dr. Dwyer testified that in order to address the issue of competency to stand trial, the statute states that there must be a severe mental disease or defect that is impairing the individuals to either understand the proceedings against them in court and/or impairing their ability to assist their attorney with their defense. (Tr. at 34)  When an individual arrives at the detention center, Dr. Dwyer testified that he first examines the individual and determines whether or not a severe mental disease or defect exists. (Tr. at 34-35)  If one exists, the next step is to see whether or not that severe mental disease or defect is impairing either the individual's ability to understand what is going on in court or their ability to help their attorney with their defense. (Tr. at 35)

13.     The work Dr. Dwyer did in this case consisted of meeting with defendant Gallegos, reviewing a previous evaluation that had been done in New Mexico, reviewing Gallegos' school records, speaking with Gallegos' mother over the phone and reviewing the initial interrogation of Gallegos by the police with respect to the current offense as well as legal paperwork that came with Gallegos. (Tr. at 40-41)

14.     Dr. Dwyer initially administered a Mini-Mental Status Examination to defendant Gallegos. (Tr. at 41, 45)  This test merely gives a ballpark view of whether or not an individual may be suffering from some sort of cognitive impairment. (Tr. at 41)  Dr. Dwyer next administered an intelligence test to Gallegos–the WAIS III (Wechsler Adult Intelligence Scale, Third Edition). (Tr. at 37, 45)  The WAIS III gives an individual's IQ score. (Tr. at 38)  Gallegos scored a full scale IQ score of 58 which is within the extremely low range of intellectual functioning. (Tr. at 45)  An IQ of 70 is considered the cutoff for mental retardation. (Tr. at 45)  Elementary school and Charter Hospital records indicate that Gallegos had a full scale IQ score of 98 (at age 9) and a full scale IQ score of 93 (at age 10), which scores are within the average range. (Defendant's Ex. 5)  In his Forensic Evaluation, Dr. Dwyer stated that the significant difference in scores may indicate that Gallegos' intellectual functioning has worsened over time, or that Gallegos is currently exaggerating his cognitive difficulties. (Defendant's Ex. 2)  Dr. Dwyer was concerned that Gallegos was not putting forth optimal effort. (Tr. at 46)  Dr. Dwyer then administered the VIP test to Gallegos–the Validity Indicator Profile–a test designed to assess an individual's effort with respect to cognitive testing. (Tr. at 39, 45)  Dr. Dwyer testified that on this test, Gallegos appeared to be giving effort. (Tr. at 54)  Finally, Dr. Dwyer gave Gallegos a Revised Competency Assessment Instrument–this is more of an interview that a psychological test and it assesses an individual's knowledge of the issues related to competency. (Tr. at 42, 45)  Dr. Dwyer testified that Gallegos gave a lot of "I don't knows" to information that, based on his history, he ought to have known. (Tr. at 54)

15.     In the section entitled Understanding of Criminal Charges, Court Proceedings, and

8

Ability to Assist Counsel of the Forensic Evaluation dated July 23, 2007, Dr. Dwyer set forth the following conclusion:

> Overall, Mr. Gallegos did not demonstrate an adequate grasp in any relevant area of the process of criminal proceedings and skills to assist counsel. Most of his responses were "I don't know," and he did not respond to efforts to educate him on these mattes. Mr. Gallegos did not appear to put forth much effort with respect to part of the evaluation. This may be due to a number of factors. Mr. Gallegos reported his concerns about being evaluated by this clinician rather than a private clinician just before this part of the evaluation, and he expressed some suspiciousness of the clinician's motives.[2] He may not have exercised much effort during this part of the evaluation due to his experience with previous efforts to educate himself, which likely were largely ineffective if his test scores are accurate. Mr. Gallegos may also be exaggerating his level of cognitive deficits in order to intentionally be found not competent to stand trial. At this time, however, he did not display a reasonable factual understanding of the trial process and ways he could help his attorney, due to a lack of insight and understanding regarding his current legal situation.

(Defendant's Ex. 2 at 19-20)

16.     The Forensic Evaluation dated July 23, 2007, concluded with the following under the section entitled Opinion on the Issue of Present Competency to Stand Trial:

> Based on the information available, there is significant evidence to indicate that Mr. Gallegos does suffer from a mental disorder that significantly impairs his present ability to understand the nature and consequences of the court proceedings against him, and substantially impairs his ability to properly assist counsel in a defense.
>
> Mr. Gallegos's current difficulties with cognitive impairment are so prominent that they have significantly interfered with his ability to understand the nature and consequences of the court proceedings against him, in addition to his ability to properly assist counsel in his defense. Most critical is Mr. Gallegos's apparent limited ability to attend to information and concentrate, in addition to difficulty presenting information in a rational, sequential manner. He is also impaired in his ability to realistically and rationally apply information and make decisions regarding his case. He demonstrated an inability to consistently remember information from one

---

[2]Other inmates had advised defendant Gallegos not to cooperate with Dr. Dwyer because he was with the government. (Tr. at 43-44, 67)

9

meeting to the next and he displayed significant difficulty in being able to adequately memorize and recall information presented to him, all of which would be necessary to some extent to properly assist counsel in a defense. It is suggested that his presence in the courtroom would be counter productive given his current presentation.

Mr. Gallegos's impaired cognitive functioning may likely be inflexible in nature, in that it may prove resistant to positive change. This will depend on how various factors are impacting his intellect and memory. If his cognitive deficits are the result of a long-standing head injury, or long-term substance abuse, his cognitive abilities will likely not significantly improve. However, if his current scores are at least partly the result of a lack of effort, or intentional exaggeration, then improvement in the future would be expected once Mr. Gallegos's attitude toward the evaluation process was addressed. A longer term evaluation during a restoration effort will allow for a better determination of Mr. Gallegos's true cognitive abilities.

In view of Mr. Gallegos's mental condition, it is recommended that he be committed to a federal medical center for treatment for restoration to competency pursuant to 18 U.S.C. Section 4241(d). The commitment would allow for a longer period of observation and evaluation of mental functioning, by continuing to educate Mr. Gallegos regarding the court proceedings, and to allow for efforts that may improve his cognitive abilities and/or degree of effort. However, given the possibility that his cognitive impairment may be permanent, due to pre-natal trauma, head trauma or long-standing substance abuse, even following treatment, the prognosis for significant improvement is guarded at best.

(Defendant's Ex. 2 at 20)

17.     At the hearing, Dr. Dwyer testified that given the inconsistencies he saw with defendant Gallegos, he made the decision to find Gallegos incompetent for the following reasons:

> ... And given this disparate information, generally speaking, you know, most cases that come before us, most evaluations that come for competency, somebody's found competent. But it's also a very important issue, and I think if there's conflicting information and some level of doubt about whether somebody's competent or not, the reasonable choice to my mind is to go ahead and ask for a period of restoration both to allow for the individual to attempt to learn some of these things that they weren't able to demonstrate knowledge on, as well as to have a longer period of time for the evaluators to observe the individual in a medical center where there's more staff. They can see how they're doing on a more frequent, regular basis,

10

make observations about their adaptive functioning, how do they take care of themselves, what kinds of activities do they engage in, to see if there's any other inconsistencies. That is typically better handled at a medical center because they have four months for restoration period versus 30 days, and at a general population facility like mine, you've got 100 inmates being observed by one officer at any given time. So, you know, the data you get, you know, it's going to be like, yeah, he seems to be doing okay. I see him, you know, go out in the rec yard and play basketball. He watches TV. But they're not going to have conversations with these guys to see, you know, whether or not they–you get more information from a medical center. So, that was the deciding factor for me.

(Tr. at 55)

18.   While defendant Gallegos was at the Federal Detention Center in Englewood, Colorado, he did not exhibit any behavior problems. (Tr. at 44) The officers and health services staff reported that his behavior on the unit was appropriate at all times. (Tr. at 44) While at Englewood, Gallegos was on anti-depressant and anti-psychotic medication. (Tr. at 44) Dr. Dwyer testified that Gallegos did not demonstrate any symptoms of psychosis while at Englewood. (Tr. at 69) Dr. Dwyer did not see anything psychologically that would render Gallegos incompetent to stand trial. (Tr. at 70) This is why Dr. Dwyer focused on the cognitive issue. (Tr. at 70)

19.   Dr. Dwyer testified that defendant Gallegos was sent to the Federal Medical Center in Butner, North Carolina for the restoration process. (Tr. at 56) Dr. Dwyer testified that the only test administered to Gallegos at Butner was the MMPI (Minnesota Multiphasic Personality Inventory). (Tr. at 38, 56) This test provides a snapshot of an individual's clinical and personality functioning at the time that they are administered the test. (Tr. at 39) This test does not provide any significant neuro-psychological information. (Tr. at 57) Dr. Dwyer had hoped that tests like the Wechsler Memory Scale and the Neuro-Behavioral Cognitive Examination would be administered at Butner. (Tr. at 57) Other tests were not administered at Butner because Gallegos refused to take any other tests. (Tr. at 73) Dr. Dwyer testified that based on his interpretation of the results of the MMPI administered at Butner, it appears that Gallegos was exaggerating his symptoms and that there was some effort on his part to look worse than he was at the time. (Tr. at 60-62)

20.   At the hearing, Dr. Dwyer gave the following opinion on whether defendant Gallegos is malingering:

My opinion, having looked at all of this data between all of the evaluations, is that this is a complicated case that has a little of all of the above. I think that you've got an individual in Vincent whose got a relatively low IQ. I

11

think you've got an individual who has some personality difficulties, you know, related to anti-social personality disorder. I think you've got an individual who has a major mood disorder. I think the history is clear that he is impulsive. I think the history is clear that he has poor frustration tolerance. I don't think Vincent would argue with that. What I would also say is that when he was meeting with me, he gave inadequate effort. I don't know whether it was intentional or not with me. I think the data was unclear on that. I think the Reliable Digit Span that was cited would suggest yes. I think that the VIP would suggest no. So, that's why I didn't make a formal diagnosis of that. I wanted to clarify it. I think some of the other data that's come up since then has suggested some of the same inconsistency on his part. And I think that it's important, you know, for the Court to know that an individual can have a mental health issue and be malingering at the same time. That's what makes cases like this so difficult. You can have a low functioning individual who is also attempting to make themselves look even lower, and that's where this gets very tricky and dicey in terms of being careful in sorting these issues out.

(Tr. at 63-64)

21.    Dr. Dwyer testified that if defendant Gallegos had scored at the level that he later scored while being tested by Dr. Leaf while defendant Gallegos was in Englewood, Dr. Dwyer would have found that Gallegos' cognitive deficits do not rise to the threshold that is required to be considered a severe mental disease or defect. (Tr. at 73-74) Dr. Dwyer testified that the IQ scores obtained by Dr. Leaf were more consistent with the scores that had been documented in the school and hospital records of Gallegos when he was younger. (Tr. at 74) Dr. Dwyer testified that when one looks at all the evidence, a fair estimate of Gallegos' full scale IQ would be somewhere in the range between 78 and 85. (Tr. at 74) An IQ in the range between 78 and 85 would not be enough in and of itself to result in a finding of incompetence. (Tr. at 75) Looking at other test results, Dr. Dwyer testified that nothing falls low enough to suggest that Gallegos has a severe mental disease or defect. (Tr. at 75)

22.    Dr. Dwyer testified that there was nothing from his period of observation of defendant Gallegos that would cause him to question the conclusions of the Butner doctors. (Tr. at 78) Dr. Dwyer does not believe that the doctors at Butner misread anything. (Tr. at 79)

23.    From July 1, 2007 to June 30, 2008, Dr. Jeffrey Childers was in a fellowship at the University of North Carolina Hospitals in forensic psychiatry. (Tr. at 83, 109; Government's Ex. 1) During this fellowship, Dr. Childers worked at the Federal Medical Center in Butner. (Tr. at 83) 75 to 80 percent of the work that Dr. Childers did at Butner consisted of competency evaluations for federal inmates. (Tr. at 83-84) Defendant Gallegos was admitted to the Federal Medical Center on September 20,

12

2007. (Tr. at 85; Government's Ex. 2) Dr. Childers worked with defendant Gallegos from September until the end of December 2007, when Dr. Childers' stay at Butner was over. (Tr. at 85) Dr. Childers testified that he did go back to Butner on three of four occasions between the end of December and the time when Gallegos left Butner so that he could check on Gallegos and finish up the report. (Tr. at 85) Dr. Childers estimated that he had eight to ten hours of direct face-to-face time with Gallegos and then informal observations of Gallegos as a result of just being present in the facility. (Tr. at 85)

24. The Forensic Evaluation prepared by Dr. Childers states in part:

... On 11/29/07, [Gallegos] admitted to nursing staff he had been dishonest when taking a psychological test he had previously been administered. He said, "I lied on the test I took. I didn't answer the questions as I was to do." When approached by his doctors, he agreed to participate in further testing, but when his psychologist made plans to test him further, he said he would not take any further tests. Nursing reported Mr. Gallegos told them he was upset, angry, and uncooperative with testing because he would likely be found "competent" and is charged with a serious crime.

On several occasions, Mr. Gallegos' legal matters were reviewed with him. He said he understood the seriousness of his charges and said they were "very serious." He said he was undecided as to if he would plead guilty or not guilty. He was able to identify his attorney and said he felt he would be able to help his attorney legally represent him. Mr. Gallegos stated a good and factual understanding of the roles of different people in the courtroom, including the Judge, his attorney, the United States attorney, and the jury. He knew the difference between a 'guilty' and 'not guilty' plea, and developed an adequate understanding of plea bargaining. Initially, he said a plea bargain "is when you make a deal." After education on the subject during serial interviews, Mr. Gallegos was able to understand plea bargaining using a hypothetical legal situation.

* * *

Mr. Gallegos was placed in the Competency Restoration Group. Although he was encouraged to attend regularly, he did not do so. Regarding the group, he exclaimed, "Why do I need to go? You have already decided I'm competent!"

* * *

Mr. Gallegos was administered the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2). A review of the validity scale profile indicates he likely exaggerated psychological symptoms. His responses to some of the critical items support this interpretation. He endorsed seeing things or animals others do not see, hearing voices without knowing where they come from, and answered true to some

13

items reflecting persecutory ideation. He later told the unit nurse he had "lied" when taking the test and asked to take it again to anser items truthfully.

Mr. Gallegos spent the majority of the evaluation period in the secure housing unit. However, the treatment team psychologist approached him about further testing on several occasions. He declined to participate although he had told the nurse he wanted to take the MMPI-2 again. He also told the primary evaluator he would participate but then changed his mind once the psychologist approached him. It should be noted his test results, which reflect exaggeration of psychological problems, coincide with his initial behavioral presentation at this facility. He has also been noted to be inconsistent in his self-report, in his interactions with staff, and in his effort during the evaluation process.

\* \* \*

With regard to the Court's questions as to competency, it is our current opinion that although Mr. Gallegos has a mental disease or defect, namely Major Depression, Substance Abuse, and Antisocial Personality Disorder, his mental illness does not preclude him from participating in his legal proceedings if he so chooses. He is able to understand the nature and consequences of the proceedings against him and assist his attorney in his defense.

(Government's Ex. 2 at 8-10, 12)

25. Dr. Childers testified that based on the Butner nurses' and custodial personnel's observations of defendant Gallegos, Gallegos appeared to be a normal population inmate. (Tr. at 87) Gallegos seemed able to voice his opinions and to bring up concerns that he might have. (Tr. at 87) The nurses and custodial personnel did not see that Gallegos was behaving abnormally in any way. (Tr. at 87) Dr. Childers testified that most of Gallegos' symptoms were behavioral, that is difficulty with irritability and anger management, rather than psychiatric. (Tr. at 91) Dr. Childers took Gallegos off his anti-psychotic medicine because Dr. Childers believed that Gallegos did not need anti-psychotic medication to manage behaviors and thought processes. (Tr. at 92-93) Dr. Childers testified that if someone is taken off anti-psychotic medication and that person does have a psychotic process, within a few days the person would start having psychotic symptoms. (Tr. at 94) There was no change in Gallegos' mental status after he was taken off his anti-psychotic medication. (Tr. at 95-96) Dr. Childers testified that this indicates that Gallegos likely does not suffer from a psychotic illness. (Tr. at 96)

26. Dr. Childers testified that while one can never be one hundred percent confident that one's decision in a field such as psychiatry is exactly what is happening, he ranks his finding of competency of defendant Gallegos in the high 90s. (Tr. at 98) The childhood trauma Gallegos suffered did not influence Dr. Childers' analysis of

14

Gallegos' behavior and thought processes at Butner and his ability to meet the standards of competency. (Tr. at 119)

27.    Dr. Childers did not conduct any neuropsychological testing on defendant Gallegos because after meeting Gallegos and speaking with him and observing his interactions at Butner, he did not believe a neuropsych evaluation would be helpful in any way. (Tr. at 121)  Dr. Childers saw no neurological impairments so he did not feel that neuropsychological testing was necessary. (Tr. at 122)

28.    Dr. Bruce Berger acts as the forensic training director for the University of North Carolina Forensic Psychiatric Fellowship Program. (Tr. at 125) Dr. Berger has been teaching forensics since 1992 at the Butner complex. (Tr. at 125)  Dr. Berger is board certified in adult psychiatry, child and adolescent psychiatry and forensic psychiatry. (Tr. at 125) Dr. Berger worked as a treating physician from time to time with defendant Gallegos and he also worked as the direct supervisor of Dr. Childers who was the primary evaluator in Gallegos' case. (Tr. at 125-26)  Dr. Berger testified that Dr. Childers' report matched Berger's general impressions of Gallegos. (Tr. at 126)  Dr. Berger further testified that based on Gallegos' presentation at Butner, he did not see a need to conduct neuropsych testing. (Tr. at 129)

29.    Dr. Jill Grant has worked over twenty years at the master's level in the Department of Corrections in North Carolina and over fifteen years in the Bureau of Prisons at the doctoral level. (Tr. at 138) Dr. Grant was the first mental health specialist that defendant Gallegos saw at Butner. (Tr. at 138)  Dr. Grant interviewed Gallegos when he arrived at Butner. (Tr. at 138) Dr. Grant testified that Gallegos was quick to tell her that he had a history of bipolar disorder and depression; that he had engaged in self-mutilization multiple times; and that he had tried to commit suicide in the past. (Tr. at 138-39)

30.    Dr. Grant testified that defendant Gallegos was administered the MMPI-2 test. (Tr. at 139) Following Gallegos' completion of the test, Dr. Grant received a report from the nursing staff that Gallegos had told the nursing staff that he lied on the test and wanted to take it over. (Tr. at 142)  Both Dr. Grant and Dr. Childers offered to let Gallegos retake the test, but he refused to take it again. (Tr. at 142)  Dr. Grant would have liked to have administered other tests to Gallegos, but she was unable to administer other tests due to Gallegos' lack of cooperation. (Tr. at 142-44)

31.    Dr. Stanley Golon has been a board certified psychiatrist for 27 years. (Tr. at 173) Dr. Golon did some forensic work through his residency, 25 years ago, but none recently. (Tr. at 173)  In this case, Dr. Golon initially provided a review of records and prepared a report on his review of those records and later met with defendant Gallegos and conducted a mental status examination and prepared a report regarding Gallegos' competency. (Tr. at 174) Dr. Golon's initial report, dated April 7, 2008, provides in part:

15

Thus, it is the opinion of this reviewer that the mental status of Mr. Gallegos remains equivocal, and the existence and implications of an organic basis remain unknown, or, at least, unclear. A comprehensive Neuropsychological Examination including an assessment of memory function, intellectual and executive function, and overall level of cognitive capacity needs to be conducted. The range and number of neuropsychological tests and test batteries is extensive and diverse, but should, minimally include the Wechsler test instruments for intelligence and memory, Trails A and B, the Reitan Aphasia, amongst others. The remaining test battery would be better left to the discretion of the Neuropsychological examiner. ... Two possible candidates that could perform these examinations are Dr. Richard C. Kaspar and Dr. Leaf E. Leif, both are local and well qualified. ...

(Defendant's Ex. 4)

32.    Dr. Leif Leaf met with defendant Gallegos at CCA over three days (June 25 and 26 and July 2, 2008) for a total of eight hours to conduct testing. (Tr. at 151; Defendant's Ex. 3) The bulk of Dr. Leaf's current practice is family therapy, work for the Social Security Administration and neuropsychology. (Tr. at 167) Dr. Leaf has not done much forensic work in the course of his career. (Tr. at 149) Prior to this case, Dr. Leaf had never performed a federal competency examination. (Tr. at 169) Dr. Leaf gave Gallegos an IQ assessment, the Wechsler Memory Scale, the Trails Making Test, motor screening (a neuropsychological assessment of sensory perceptual screening), the Wide Range Achievement Test (an academic test), the Rey 15-item test, the Rey Complex Figure Test, the Beck Depression Scale, the Wisconsin Card Sort, the House-Tree-Person Test, the Controlled Oral Word Association, the Incomplete Sentence Blank Test and a clinical interview. (Tr. at 151, 157-58) The results of the intelligence testing indicated that Gallegos was in the borderline range or low average range of intellectual functioning: scoring a verbal IQ of 74, a performance IQ of 86 and a full scale IQ of 78. (Tr. at 151-52, 156) Gallegos scored significantly higher than he had in Englewood, Colorado. (Tr. at 152) On the Wechsler Memory Scale, Gallegos scored in the borderline to low average range overall. (Tr. at 157) On the Wide Range Achievement Test, Gallegos scored at the early high school level in reading, at an eighth-grade level is spelling and at a third-grade level in math. (Tr. at 158) Gallegos told Dr. Leaf that he was taking classes to obtain a GED. (Tr. at 158; Defendant's Ex. 3 at 4) On the Wisconsin Card Sort, Gallegos was in the normal range. (Tr. at 163) Dr. Leaf testified that he believed Gallegos tried to do well during the testing and that he did not malinger. (Tr. at 166)

33.    Dr. Leaf prepared a Psychological Evaluation and Neuropsychological Assessment Report. (Defendant's Ex. 3) The report concluded:

        **COMPETENCY FINDINGS and IMPLICATIONS:** It is recommended

that Vincent continue to receive psychiatric services and counseling to help him develop coping strategies and adjust to his current stressors. He has been evaluated on numerous occasions during the past 2 years and various diagnostic implications have been suggested. Overall his borderline intellectual scores (which seem to have improved with repeated exposure to the WAIS) and his brash personality contribute to an initial impression that this is an individual who functions fairly well and is able to understand subtle social and legal nuances. However, results of the current evaluation consistently indicate significant memory deficits, verbal skills challenges and underdeveloped personality features as well as marked depression, antisocial personality, substance abuse issues and cognitive disorder NOS.

Significant social skills deficits, exacerbated by enduring personality disorders have and most likely will continue to interfere with his ability to develop and maintain social relationships. His poor impulse control and limited insight will prevent him from engaging in effective information processing, which will continue to impact his judgment and decision making. Although he may appear to process surface information, his ability to appreciate and understand complex legal concepts will be compromised by his executive function deficits and make it difficult for him to truly comprehend cause and effect relationships. He has limited ability to understand the consequences of his own actions or take the needed time to determine alternative actions. These compromises will limit his effectiveness and competency in assisting counsel in his defense. As noted by his current psychiatrist, Dr. McCandless M.D. his mental presentation was "sufficiently deficient" and consistent with a prior exam that found him not to have the mental capacity or stability to represent his own interests in court. The claimant may know the functions of the court and those involved but he does not currently present the cognitive awareness to appreciate the full implications of a guilty plea. An example of his simplistic thinking is that during the exam he asked, "If I plead guilty can we stop the testing and I can go to prison and learn to be an air-brush artist?" The inmate does not have the capacity to understand the severity of all the constitutional rights he is forgoing by pleading guilty and he fails to grasp that he is facing a drug charge even though he neither bought or sold drugs. The claimant's understanding of the murder charge is limited by his lack of understanding of the fact that he shot the victim only after the victim hit him in the stomach with a shotgun.

In regards to his ability to testify the inmate's current psychiatric status is such that he does not handle stress well, is anxious and is easily overwhelmed. His frustration tolerance and stress reaction are at a level that would adversely impact his ability to withstand a trial in federal court for an extended period of time. As with prior evaluations the claimant is

17

incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him.  The inmate's intellectual abilities and cognitive skills severely impact his abilities to process verbal interaction and comprehend complex legal jargon.  These factors minimize his effectiveness to assist properly in his own defense.

(Defendant's Ex. 3 at 8-9)

34.     Dr. Leaf testified that defendant Gallegos could understand the complexities of federal law involved in his case, but it would take a lot of effort on his part and a lot of education.  (Tr. at 164)  Dr. Leaf then testified that Gallegos was incompetent to the extent that he is not able to understand the nature and consequences of the proceedings.  (Tr. at 165)  Dr. Leaf agreed that the competency issue in this case is a pretty close question; that it is not clear-cut.  (Tr. at 166)

35.     Dr. Golon met with defendant Gallegos on October 8, 2008, for approximately two hours and conducted a complete mental status examination.  (Tr. at 178; Defendant's Ex. 4)  Dr. Golon's Psychiatric Evaluation provided:

### Opinion on the Issue of Present Competency to Stand Trial

Due to a combination of an ongoing significant psychotic illness and Cognitive Disorder NOS, it would be questionable whether Mr. Gallegos would be able to keep the events of a trial in sequence in his mind and he would not be able to follow the trial as it progresses.

While Mr. Gallegos has a rudimentary understanding of the changes [sic] and the capacity to appreciate the range and nature of possible penalties, he has numerous misconceptions and gaps in his knowledge about the process of a trial.  Mr. Gallegos' ability to engage in abstract thinking and his abilities to memorize and concentrate are so minimal that he would be unable to conceptualize the roles of the various participants in the trial and he would not be able to give his attorney relevant facts as the trial progresses, nor would he be able to comprehend instructions and advice.  His capacity to manifest appropriate courtroom behavior may be challenged by his poor impulse control.  An anxiety provoking situation such as this may aggravate his psychosis and lead to irrational and unmanageable behavior during the trial.

There is no evidence of malingering or attempting to fake symptoms, impairments, or disability.

In my opinion, these impediments are due to Psychosis and Cognitive Disorder and he has benefited [sic] from current treatment, but they are

18

unlikely to significantly improve in the future.

(Defendant's Ex. 4) Dr. Golon gave defendant Gallegos a diagnosis of schizoaffective disorder. (Defendant's Ex. 4) Dr. Golon described schizoaffective disorder as a combination of severe chronic depression with periods of psychotic symptoms. (Tr. at 176) Dr. Golon believes that Gallegos' intellectual functioning has deteriorated over the years due to poly-substance abuse of illicit substances and a head trauma. (Tr. at 182-84)

36.     Dr. Golon testified with respect to his conclusion about defendant Gallegos' competency as follows:

> I think overall he would be not competent to follow a trial. I think in asking him any specifics, he has some rudimentary understanding of the trial process. He has an understanding of the charges against him, but in terms of helping his attorney and following the trial, his memory just isn't there. And that possibly could be also hurt by his depression and his paranoia affecting his judgment. I think he would have a great difficulty following what's going on. Many times I have to repeat questions for him. He himself stated a lot of times that his attorney has been helpful to him, but he doesn't remember what she says and he's embarrassed about having to ask the same questions over and over. I think he would have difficulty following advice, comprehending instructions, both due to his paranoia, his depression, partially his lack of caring what happens to him. And I think that's from the depression where he kind of has an Antigonia fatalism where he doesn't really care what happens and also just his overall intellectual functioning would prevent him from being very effective in helping with his defense. Obviously, that's not the entire picture with his scores in the 70s, but I also think there's a slight chance that with his poor impulse control, he could get very anxious and agitated during the trial.

(Tr. at 186-87) Dr. Golon admitted that whether or not defendant Gallegos is competent to stand trial is a close question and that it could go either way. (Tr. at 187)

37.     With respect to Dr. Golon's diagnosis of schizoaffective disorder, Dr. Berger testified that he did not see a discussion in Dr. Golon's report regarding symptoms that would be consistent with a schizoaffective disorder. (Tr. at 130) Dr. Berger testified that Dr. Golon's report merely gave this conclusion without specific reasoning. (Tr. at 130) According to Dr. Berger, it would take several months for a doctor to evaluate a patient with his own eyes and come up with a valid diagnosis of a schizoaffective disorder. (Tr. at 131) Typically, a doctor would make such a diagnosis after direct behavioral observations of the patient and how they appear to react to their environment. (Tr. at 131) In order to have a schizoaffective disorder,

19

a patient must experience at least two weeks of frank psychotic symptoms, those being hallucinations or delusions. (Tr. at 132) While defendant Gallegos did self-report psychotic symptoms during the time he was being treated at Butner, Dr. Berger did not observe any corroboration of these symptoms. (Tr. at 134) Rather, Gallegos did not appear to have the other symptoms consistent with hallucinations, which would speak against him actually having them. (Tr. at 134)

38.  Dr. Golon agreed that a team of forensic doctors who had the opportunity to observe defendant Gallegos in a hospital in-patient setting over a number of months would have an advantage in determining whether or not self-reported delusions were real or feigned. (Tr. at 190) However, Dr. Golon further testified that Dr. McCandless has had an opportunity to see Gallegos on a regular basis while he has been incarcerated at CCA and that she has him on anti-psychotic medication. (Tr. at 190-91)

39.  Dr. Daniel Martell has reviewed all the records in this matter, but has not conducted an examination of defendant Gallegos. (Tr. at 191-92) Dr. Martell had issues with Dr. Leaf's neuropsychological testing of Gallegos. (Tr. at 195) According to Dr. Martell, Dr. Leaf did not use a standard form in administering the Trails A and Trails B tests so any results obtained cannot be compared to standardized norms. (Tr. at 195-96) If one were to assign a score to this it would be an invalid score which would then generate invalid conclusions. (Tr. at 197) Dr. Martell testified that Dr. Leaf also deviated from standardized administration with the Wechsler Intelligence Scale and as a result rendered his findings uninterpretable. (Tr. at 197) Dr. Martell testified that Dr. Leaf did not score the Wechsler Memory Scale test correctly rendering it also uninterpretable. (Tr. at 203-04) Dr. Martell questions the basis for Dr. Leaf's conclusion that global mentation and mental control are overall moderately impaired when Dr. Leaf did not give any tests over those things. (Tr. at 207)

40.  Dr. Martell reviewed the two DVDs on which defendant Gallegos' post-arrest interrogation and statements were recorded. (Tr. at 214) These DVDs are Government's Exhibits 8-a and 8-b. Dr. Martell notes that Gallegos was able to invoke his Miranda rights which shows a clear cognition of his situation and his rights in that context.[3] (Tr. at 214-15) Dr. Martell further notes that Gallegos did not demonstrate any deficit in his ability to convey information about his charges to the detectives. (Tr. at 215) Dr. Martell contrasts this with the manner in which Gallegos

---

[3]The Court has also reviewed the two DVDs. Defendant Gallegos clearly states, "I want a lawyer. I have the right to remain silent." Thus ending an extremely persuasive attempt by two police detectives to interrogate Gallegos. (Government's Ex. 8-a) The Court notes that after returning to his cell, Gallegos changed his mind and requested to speak to the detectives again. (Government Ex. 8-b)

20

presented himself to Dr. Martinez when she evaluated his competence to stand trial for charges related to a commercial burglary that occurred on May 11, 2005, in New Mexico. (Tr. at 214) Before Dr. Martinez, Gallegos appeared to decompensate after being asked about his charges and the legal process. (Defendant's Ex. 1; Tr. at 214)

41. Dr. Martell testified that defendant Gallegos' test results at the Federal Detention Center in Englewood, Colorado, showed a lack of effort rather than a loss of intellect. (Tr. at 215-16) A sudden drop in Gallegos' IQ from being in the average or low average range into the range of significant mental retardation is a red flag. (Tr. at 215) Gallegos' Reliable Digit Span score also indicated malingering. (Tr. at 215-16) Dr. Martell further testified that the fact that Gallegos required multiple sessions in order to recall the purpose of the examination evidenced gross symptom production. (Tr. at 216) Especially given the fact that Gallegos was able to socialize normally with other inmates and had no difficulty in functioning on the unit. (Tr. at 216)

42. Dr. Martell testified that defendant Gallegos used the same answers ("I don't know" or "This is too hard") during his competency assessment at Englewood that he had used when assessed on the previous New Mexico charges. (Tr. at 216) Dr. Martell opined that Gallegos had previously been found not competent to stand trial in New Mexico and was employing the same procedures in this case because they had worked for him before. (Tr. at 216) Dr. Martell found it significant that while defendant Gallegos was "unable to articulate the meaning of not guilty by reason of insanity, even after multiple attempts at education,"[4] while evaluated at Englewood, he allegedly told Farryn Raney that he was going to use his history of mental disorder to raise an insanity defense, suggesting he clearly understood the idea. (Tr. at 217)

43. Dr. Martell gives the following Analysis and Forensic Opinion in his report dated October 2, 2008:

> It is my opinion that the central issue complicating this case, and the one upon which a valid determination of his competency ultimately turns, is the extent to which Mr. Gallegos has been malingering symptoms in an effort to appear incompetent.
>
> The record makes clear, at points by Mr. Gallegos' own admission, that he has been malingering symptoms at multiple times in the past in an effort to appear incompetent. Viewed with the benefit of hindsight, there is evidence that Mr. Gallegos has malingered impairment in each of the settings where his competency has been assessed.

---

[4](Defendant's Ex. 2 at 18-19)

Perhaps most telling in this regard, if true, is Mr. Gallegos' alleged statement to [Farryn] Raney that he was going to use his past mental health issues as a defense. ... It is certainly apparent that he wants the police to know that he is mentally-ill in his videotaped statements following his arrest, in which early-on he volunteers his full psychiatric history (manic-depression, hearing voices and seeing things, anxiety, his brain not working properly due to huffing paint), and points out that he has been off his medications since coming to Kansas City. ... It is also significant that at the time of his arrest, he demonstrates intact cognitive functioning in that he understands the *Miranda* warnings, appreciates the charges he's facing and their potential consequences, and both understands and invokes his right to counsel and his right to remain silent.

It is apparent from the history that Mr. Gallegos does suffer from a mental disorder, namely Major Depression, as well as substance abuse disorders and Antisocial Personality Disorder. It appears uncontested that his depressive disorder is currently well controlled with medication and does not significantly interfere with his fitness to proceed. ... While there have been reports in the records that he has had psychotic experiences (i.e., auditory and visual hallucinations), these appear to be confounded with drug abuse, and at other times appear to be fabrications generated by Mr. Gallegos in an effort to appear mentally ill. No expert has opined that he is currently incompetent due to a psychotic disorder.

The experts who have provided opinions that Mr. Gallegos is currently incompetent have based that opinion on findings of *cognitive impairment* interfering which [sic] his fitness to proceed. ... However, it is my opinion to a reasonable degree of neuropsychological certainty that Mr. Gallegos has been systematically malingering and/or intentionally under-performing on the psychological testing that has been administered to him across settings, in an effort to manipulate his examiners and appear cognitively impaired when he in fact is not. Hence, there is no basis for finding him incompetent to stand trial.

(Government's Ex. 7 at 11-12)

### III. DISCUSSION

After there has been an adjudication of incompetence and the defendant has been committed to the Attorney General for a determination as to whether there is a substantial probability that in the foreseeable future the defendant will attain the capacity to permit the proceedings to go forward,

Case 4:06-cr-00421-DW   Document 161   Filed 02/24/09   Page 22 of 27

as in this case, pursuant to 18 U.S.C. § 4241(e), the burden of persuasion shifts to the Government.
See United States v. Cabrera, 2008 WL 2374234, *6 (S.D. Fla. June 6, 2008). As set forth in
Cabrera, "the court must find by a preponderance of the evidence that the defendant has recovered
to such an extent that he is able to understand the nature and consequences of the proceedings
against him and to assist properly in his defense."

Various psychologists and psychiatrists have evaluated defendant Gallegos and have arrived
at different conclusions about his competence to stand trial. The results of these evaluations break
down as follows:

- Lori Martinez, Psy.D., Licensed Clinical Psychologist, evaluated defendant
  Gallegos on January 13, 2006, and found him not competent to stand trial on
  commercial burglary charges. (See Fact No. 8, supra)

- Jeremiah Dwyer, Ph.D., Forensic Psychologist, evaluated defendant Gallegos
  at the Federal Detention Center in Englewood, Colorado, where Gallegos
  was sent for a thirty-day evaluation, and found him not competent to stand
  trial on the current charges. Dr. Dwyer testified that he made the decision to
  find Gallegos incompetent for the following reasons:

  > ... I think if there's conflicting information and some level of doubt
  > about whether somebody's competent or not, the reasonable choice
  > to my mind is to go ahead and ask for a period of restoration both to
  > allow for the individual to attempt to learn some of these things that
  > they weren't able to demonstrate knowledge on, as well as to have a
  > longer period of time for the evaluators to observe the individual in
  > a medical center where there's more staff. They can see how they're
  > doing on a more frequent, regular basis, make observations about
  > their adaptive functioning, how do they take care of themselves, what
  > kinds of activities do they engage in, to see if there's any other
  > inconsistencies. That is typically better handled at a medical center
  > because they have four months for restoration period versus 30 days,
  > and at a general population facility like mine, you've got 100 inmates
  > being observed by one officer at any given time. So, you know, the
  > data you get, you know, it's going to be like, yeah, he seems to be
  > doing okay. I see him, you know, go out in the rec yard and play
  > basketball. He watches TV. But they're not going to have
  > conversations with these guys to see, you know, whether or not

23

they–you get more information from a medical center.  So, that was the deciding factor for me.

Dr. Dwyer further testified that had Gallegos scored at Englewood at the levels he later scored while being tested by Dr. Leaf, Dr. Dwyer would not have found Gallegos to have a severe mental disease or defect.  Finally, Dr. Dwyer testified that there was nothing from his period of observation of Gallegos that would cause him to question the conclusions of the Butner doctors.  (See Fact Nos. 13-22, supra)

• Jeffrey Childers, M.D., Forensic Psychiatry Fellow, evaluated defendant Gallegos at the Federal Medical Center in Butner, North Carolina, where Gallegos was sent for treatment for four months, and found him restored to competency.  Dr. Childers testified that while one can never be one hundred percent confident that one's decision in a field such as psychiatry is exactly what is happening, he ranks his finding of competency of defendant Gallegos in the high 90s.  (See Fact Nos. 23-27, supra)

• Bruce Berger, M.D., Staff Psychiatrist, worked as a treating physician from time to time with defendant Gallegos at Butner and as the direct supervisor of Dr. Childers.  Dr. Berger testified that Dr. Childers' report matched Berger's general impressions of Gallegos.  (See Fact No. 28, supra)

• Leif Leaf, Ph.D., met with defendant Gallegos over three day (June 25 and 26 and July 2, 2008) for a total of eight hours to conduct testing.  Dr. Leaf has not done much forensic work in the course of his career and prior to this case, Dr. Leaf had never performed a federal competency examination.  Dr. Leaf initially testified that defendant Gallegos could understand the complexities of federal law involved in his case, but it would take a lot of effort on his part and a lot of education.  Dr. Leaf then testified that Gallegos was incompetent to the extent that he is not able to understand the nature and consequences of the proceedings.  Finally, Dr. Leaf agreed that the competency issue in this case is a pretty close question and that it is not clear-cut.  (See Fact Nos. 32-34, supra)

• Stanley Golon, M.D., met with defendant Gallegos for approximately two hours.  Dr. Golon testified that whether or not Gallegos is competent to stand trial is a close question and that it could go either way.  (See Fact Nos. 35-36, 38, supra)

• Daniel Martell, Ph.D., ABPP, reviewed all the records in this matter, but did not conduct an examination of defendant Gallegos.  Dr. Martell found that Gallegos has been systematically malingering and/or intentionally under-performing on the psychological testing that has been administered to him

24

across settings, in an effort to manipulate his examiners and appear cognitively impaired when he in fact is not. Dr. Martell concluded that there is no basis for finding Gallegos incompetent to stand trial. (See Fact Nos. 37, 39-43, supra)

Thus, on the side of finding defendant Gallegos not competent to stand trial, the Court has the opinions of Dr. Martinez who met with defendant Gallegos on one occasion in January 2006 and found him incompetent to stand trial in state court; Dr. Dwyer who had the opportunity to evaluate Gallegos over a thirty-day period who admittedly found Gallegos incompetent so that he could be evaluated further at a medical center; Dr. Leaf who has never previously performed a federal competency examination who found Gallegos incompetent but who testified that the competency issue in this case is a pretty close question; and Dr. Golon who testified that whether or not Gallegos is competent to stand trial is a close question and that it could go either way. On the side of finding defendant Gallegos restored to competency, the Court has Dr. Dwyer who now agrees with the conclusions of the doctors at the medical center who found Gallegos restored to competency; Dr. Childers who had the opportunity to evaluate Gallegos over a four-month period who has expressed extreme confidence in his finding of competency of Gallegos; Dr. Berger who had the opportunity to evaluate Gallegos over a four-month period who agreed with Dr. Childers' findings; and Dr. Martell who provided testimony based on a review of the records that Gallegos has been systematically malingering and/or intentionally under-performing on the psychological testing and that there is no basis for finding Gallegos incompetent to stand trial.

The Court finds the testimony of Drs. Dwyer, Childers, Berger and Martell to be more persuasive than the testimony of Drs. Leaf and Golon and the report from Dr. Martinez. Dr. Childers worked with defendant Gallegos from September until the end of December 2007. (See Fact No. 23, supra) Dr. Childers estimated that he had eight to ten hours of direct face-to-face time

Case 4:06-cr-00421-DW   Document 161   Filed 02/24/09   Page 25 of 27

with Gallegos and then informal observations of Gallegos as a result of just being present in the facility. (Id.) Dr. Childers was also able to obtain information from the nursing and correctional officers. Based on the Butner nurses' and custodial personnel's observations, Gallegos appeared to be a normal population inmate. (See Fact No. 25, supra) Gallegos seemed able to voice his opinions and to bring up concerns that he might have. (Id.) Dr. Berger worked as a treating physician from time to time with Gallegos and as the direct supervisor of Dr. Childers. (See Fact No. 28, supra) Dr. Berger testified that Dr. Childers' report matched Berger's general impressions of Gallegos. (Id.) While Dr. Dwyer initially found Gallegos incompetent, he testified that he made this decision so that Gallegos could be evaluated for a longer period of time at a medical center where there is more staff. (See Fact No. 17, supra) Dr. Dwyer now agrees with the conclusions of Dr. Childers and Dr. Berger. (See Fact No. 22, supra) Dr. Martell provided compelling testimony regarding his review of the records in this case and how they provide evidence that Gallegos has been systematically malingering and/or intentionally under-performing on the psychological testing that has been administered to him. Finally, the Court has reviewed the DVDs (Government's Exhibits 8-a and 8-b) where defendant Gallegos is able to invoke his Miranda rights while being interviewed by two police detectives which shows Gallegos' knowledge of his legal rights and the ability to use that knowledge.

IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order finding that defendant Gallegos has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist

Case 4:06-cr-00421-DW   Document 161   Filed 02/24/09   Page 26 of 27

properly in his defense.

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

_____/s/ Sarah W. Hays_____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE
